

NUMBER 13-13-00655-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

4FRONT ENGINEERED
SOLUTIONS, INC.,                                                    Appellant,

v.

CARLOS ROSALES, INDIVIDUALLY,
AND ROSA MEJIA AS NEXT FRIEND
OF CARLOS ROSALES, JR.,                                       Appellees.

**On appeal from the 389th District Court
of Hidalgo County, Texas.**

# O P I N I O N

**Before Chief Justice Valdez and Justices Rodriguez and Garza
Opinion by Justice Garza**

This is an appeal of a judgment in excess of $10 million rendered in a personal

injury suit arising from a forklift accident. Appellant, 4Front Engineered Solutions, Inc.

("4Front"), argues that the trial court erred in rendering judgment in favor of appellees,

Carlos Rosales, individually, and Rosa Mejia as next friend of Carlos Rosales Jr. (collectively "Rosales"), because: (1) Rosales's counsel made an improper jury argument resulting in incurable harm; (2) the evidence was insufficient to support the jury's findings that 4Front "exercise[d] or retain[ed] some control over the manner in which the work was performed" and had "actual knowledge" of a danger posed by a premises defect; (3) the jury's negligent entrustment finding must be disregarded; (4) the evidence was insufficient to support the jury's finding as to causation; (5) the evidence was insufficient to support the jury's finding of gross negligence; (6) submission of a question on comparative responsibility was error; (7) the evidence was factually insufficient to support the jury's finding as to comparative responsibility; and (8) the admission of Occupational Safety and Health Administration ("OSHA") regulations into evidence was error. We modify the judgment to delete the exemplary damages award and affirm the judgment as modified.

## I. BACKGROUND

4Front, a designer and manufacturer of loading dock equipment, operates a warehouse in Pharr, Texas. In January of 2012, 4Front's Pharr warehouse manager, Tony Ornelas, hired licensed electrician Francisco Reyes to repair an illuminated business sign mounted outside above the front door of the warehouse. Reyes enlisted Rosales, also a licensed electrician, to assist him. Ornelas allowed Reyes to borrow one of 4Front's standing forklifts to do the job. On the second day of repairs, Reyes operated the forklift for at least 45 minutes, moving it back and forth along the sidewalk so that Rosales, who was standing on an enclosed platform attached to the raised forks, could access the electrical connections for the sign. At some point, one of the forklift's wheels went off the edge of the sidewalk, causing the forklift to tip over and causing Rosales to

2

fall 25 feet to the ground. Rosales suffered injuries to his hip, leg, spine, and brain as a result of the accident.

Rosales sued 4Front and Reyes, alleging premises liability, negligence, negligence per se, and gross negligence. His petition alleged that Ornelas "completely controlled the selection of equipment in use at the time of [Rosales]'s injury" and "ignored requests by Reyes that [4Front] provide more appropriate equipment for the work." Rosales alleged that 4Front, through Ornales, knew that the forklift "was unsafe for the use to which [4Front] insisted that it be used and that Reyes was not sufficiently trained in the proper and safe use" of the forklift. The following is a summary of the evidence presented at trial which is relevant to the issues raised on appeal.

## A.    Jerome Spear

Jerome Spear, an occupational health and safety consultant, testified as an expert on behalf of Rosales. Prior to trial, the trial court had granted a motion in limine filed by 4Front requesting a hearing before admitting any testimony regarding OSHA regulations. Accordingly, Spear testified at a hearing outside the presence of the jury that there is an OSHA regulation—located in section 1910.178(*l*) of title 29 of the Code of Federal Regulations—that sets basic requirements for training an operator to safely operate a forklift such as the one at issue in this case. According to Spear, the regulation requires all forklift operators to be trained, including "hands-on training in an area free of obstructions" and "classroom type" training, and certified. Spear stated that, for OSHA purposes, 4Front would be considered a "host employer" because "they provide the means and methods for—to do the work on the site." Spear identified an OSHA interpretation letter dated April 6, 1999, specifying that warehouse operators "do not have

3

to train the employees or the contractor's employees, but they have to ensure that they are trained." Spear stated that the OSHA regulation would be relevant to determining whether the owner of a forklift "knew or should have known whether a person was competent to operate the forklift." He opined that, if the operator "cannot produce verification of the [operator's] training certification," the forklift owner "should not allow them to operate at the site." Spear stated that he was aware that 4Front had adopted the relevant OSHA regulations as part of its safety policy. After the hearing, the trial court allowed Spear to testify as to the specific OSHA regulation applicable to forklift operators, but not as to the general multi-employer citation policy promulgated by OSHA.

Spear later testified at trial that he investigated the incident and made two "critical conclusions: One, it was the wrong machine for the job and two, there was no training or certification for the operator." He explained that the forklift was the "wrong machine for the job" because there was "insufficient clearance between the unprotected edge of the sidewalk and the edge of the forklift"—a total of "about nine inches on either side" with the forklift "directly centered" on the sidewalk. Spear stated that, based on his observation of the sidewalk, he would have known that it was necessary to move the forklift back and forth in order to access the sign to be repaired, and that moving the forklift back and forth was dangerous because "it increases your chances of rolling off the sidewalk." He added that moving the forklift back and forth in a straight line is "very difficult" because it has a "reverse steering" mechanism and a three-point suspension system, which "makes it easier to maneuver in tight corners, but conversely makes the back end swing quite a bit." He stated that a boom-supported elevated platform would have been the best machine for this job because it has a wide, stable base and can extend or retract to make

4

it longer or shorter. Spear explained that a scissors lift, though better than a forklift because it is narrower, would not be ideal because "you still would have to lower it before you move it." Spear testified that, if he was the safety officer at 4Front on the day in question, he would not have allowed a standing forklift to be used to access the sign, and he wouldn't have allowed a scissors lift to be used for that purpose if there were better options available.

Spear next explained that, in part because there are about 100 fatalities and 20,000 injuries that occur in the United States every year due to forklift accidents, OSHA established standards in 1998 requiring forklift operators to be trained and certified. He summarized the provisions of the pertinent OSHA regulation, a copy of which was entered into evidence.[1] He explained that the training requirements exist to protect not only

---

[1] The OSHA regulation at issue applies to "fork trucks, tractors, platform lift trucks, motorized hand trucks, and other specialized industrial trucks powered by electric motors or internal combustion engines." 29 CFR § 1910.178(a) (2014). The regulation states that, "[p]rior to permitting an employee to operate a powered industrial truck (except for training purposes), the employer shall ensure that each operator has successfully completed the training required by this paragraph (*l*), except as permitted by paragraph (*l*)(5) [regarding avoidance of duplicative training]." *Id.* § 1910.178(*l*)(1)(ii). "Training shall consist of a combination of formal instruction (e.g., lecture, discussion, interactive computer learning, video tape, written material), practical training (demonstrations performed by the trainer and practical exercises performed by the trainee), and evaluation of the operator's performance in the workplace." *Id.* § 1910.178(*l*)(2)(ii). Operators "shall receive initial training in the following topics," except those which the employer can "demonstrate are not applicable to safe operation of the truck in the employer's workplace":

(i)     Truck-related topics:

  (A)     Operating instructions, warnings, and precautions for the types of truck the operator will be authorized to operate;

  (B)     Differences between the truck and the automobile;

  (C)     Truck controls and instrumentation: where they are located, what they do, and how they work;

  (D)     Engine or motor operation;

  (E)     Steering and maneuvering;

  (F)     Visibility (including restrictions due to loading);

  (G)     Fork and attachment adaptation, operation, and use limitations;

  (H)     Vehicle capacity;

  (I)     Vehicle stability;

5

employees, but also to protect any other people that might be on site, including delivery persons, pedestrians, visitors, or other contractors. He opined that 4Front failed to comply with the OSHA regulations and the forklift's operating manual by permitting "an untrained person to operate the forklift" and that 4Front also violated its own "policy of not loaning equipment to others." Spear further stated that Reyes, the operator of the forklift at the time of the accident, failed to comply with the operating manual because he (1) used the forklift outdoors, and (2) attempted to move the forklift without first lowering the forks.

---

| | (J) | Any vehicle inspection and maintenance that the operator will be required to perform; |
| | (K) | Refueling and/or charging and recharging of batteries; |
| | (L) | Operating limitations; |
| | (M) | Any other operating instructions, warnings, or precautions listed in the operator's manual for the types of vehicle that the employee is being trained to operate. |
| (ii) | Workplace-related topics: | |
| | (A) | Surface conditions where the vehicle will be operated; |
| | (B) | Composition of loads to be carried and load stability; |
| | (C) | Load manipulation, stacking, and unstacking; |
| | D) | Pedestrian traffic in areas where the vehicle will be operated; |
| | (E) | Narrow aisles and other restricted places where the vehicle will be operated; |
| | (F) | Hazardous (classified) locations where the vehicle will be operated; |
| | (G) | Ramps and other sloped surfaces that could affect the vehicle's stability; |
| | (H) | Closed environments and other areas where insufficient ventilation or poor vehicle maintenance could cause a buildup of carbon monoxide or diesel exhaust; |
| | (I) | Other unique or potentially hazardous environmental conditions in the workplace that could affect safe operation. |
| (iii) | The requirements of this section. | |

*Id.* § 1910.178(*l*)(3). Operators must also be given "refresher training and evaluation" as necessary. *Id.* § 1910.178(*l*)(4).

6

Spear stated that, according to his investigation, Ornelas was in charge of safety on the property, Ornelas made the decision to "select" Reyes to do the work, and Ornelas "had to approve all equipment to be used" on the property. He stated that Ornelas ordered 4Front employees to attach a platform to the forklift, to drive the forklift out of the warehouse, and to give the keys to the forklift to Reyes. Spear stated that Ornelas or another 4Front employee should have monitored Reyes and Rosales and "stopped work if they saw that anything was being performed hazardously."

A surveillance video recording of the accident was played to the jury. Spear stated that, because Reyes improperly attempted to move the forklift forward with the forks elevated, he needed to be aware of both the clearance between the platform and the sign *and* the clearance between the forklift and the sidewalk. Based on the video, Spear opined that Reyes did not intentionally drive the forklift off the sidewalk. Instead, he agreed with Rosales's counsel that Reyes was "set up to fail" because it was not possible for him to concentrate on both clearances at once.

On cross-examination, Spear conceded that he only spent five minutes inspecting the warehouse location and did not get out of his car. He took no measurements of the sidewalk where the accident occurred, nor did he inspect the forklift involved in the accident or the platform attached to the forklift. He did not review regulations for electricians promulgated by the Texas Department of Licensing and Regulations. He acknowledged that Reyes and Rosales had used the same forklift to repair the same sign for several hours two days before the accident, without incident. He agreed that, according to the surveillance video, no 4Front employee was "micromanaging" Reyes and Rosales in their operation of the forklift. Spear agreed with defense counsel that there is

7

no indication that Reyes ever had training to operate a boom lift truck. He further agreed that, even if the operator of the forklift had been properly trained, the accident might still have happened because a forklift was an improper machine to use for that task. He stated that, if Rosales had asked Reyes to lower the platform before moving the forklift, there is no reason to think that Reyes would not have complied with that request. Spear testified that 4Front was more responsible than Reyes for the accident because 4Front was more "knowledgeable" and had provided the equipment.

## B. 4Front Employees

Rosales presented the testimony of three 4Front employees via video-recorded deposition excerpts. Juan Villarreal, a supervisor at 4Front's Pharr facility, testified that he would not allow any of the employees that he supervises at 4Front to use a standing lift outside the warehouse. Villarreal stated that he was not authorized to loan 4Front equipment to persons who are not 4Front employees. He agreed that it is important, if he saw personnel under his supervision engaging in unsafe practices, to ensure that they stop those practices.

Rene Felix, a certified forklift operator at the Pharr facility, testified that Rosales and Reyes should not have been using the forklift in the area where they were using it. Felix agreed that he was told that standing lifts should be used only inside the warehouse; that they should not be driven when the forks are in the raised position; and that the forks should not be raised unless the lift is still. He said he told Reyes that he did not have the authority to lend the forklift to him "because I use that equipment inside" and because "I didn't know the man." However, Ornelas, the warehouse manager, instructed him to lend the forklift to Reyes. Felix testified that Ornelas told him to put the platform on the lift and

8

to drive the lift to the front door of the office so that Reyes could use it. Later, when Felix went outside, he saw a hole made by the forklift when it fell into the grass, and heard a "guy . . . screaming." He then told Villarreal, his supervisor.

Fernando Mujica, also a certified forklift operator at the Pharr facility, testified that he was trained not to move the lift while the load was in the raised position "[b]ecause depending on the . . . weight of the load, it can . . . move and . . . the forklift can turn over." He was also taught in training that the forklift can only be used indoors. Mujica testified that Ornelas "ordered" the lift to be loaned to Reyes.

## C. Ornelas

Ornelas testified that he has been employed by 4Front as a warehouse manager since 2005. He agreed that one of his responsibilities is to manage safety at the facility, but he has never received training on forklift safety. Villarreal was his second-in-command and was authorized to supervise Felix and Mujica. According to Ornelas, 4Front had four forklifts at the Pharr facility at the time of the accident, and forklifts were used there on a daily basis. Ornelas agreed that forklift operation is a "very large part of what [we] do" at the Pharr facility. He stated: "As the warehouse manager, the responsibility falls on me that—not necessarily through me, but that [the forklifts] are being used safely, effectively and only the right person is using the equipment." He stated: "Every member at my facility in Pharr, regardless of his rank, has the right to either stop, to either report [safety concerns] immediately to either my lead person or myself that there is something not—something is being violated that concerns safety."

Ornelas acknowledged that the forklift operating manual states in multiple places that the machine should be used only by licensed, trained operators and that it should

9

only be used indoors. He conceded that he knows where the operating manual, written in English, is normally kept—inside a panel on the machine itself—but that he never required any operator to read the manual. He denied being aware that Reyes does not speak English.

Rosales's counsel asked, over 4Front's counsel's objection: "Do you know that OSHA, specifically the OSHA regulation 1910.178, requires that operators of all standing forklifts have to be trained and certified?" Ornelas replied: "I'm not sure on the exact title and number that you just gave, but on the wording itself, yes." Ornelas confirmed that he knew that prior to the date of the accident. Ornelas conceded that he stated in his deposition that he did not "know the dangers of being lifted by a forklift more than 6 feet" because he is "not trained and certified."

A document dated January 3, 2012 and entitled "4Front Engineered Solutions Safety Policy" was entered into evidence. Ornelas conceded that he is responsible for enforcing this safety policy, and he agreed that it is "something that 4Front should try to do." The policy stated, in part:

> To be successful, our safety program must embody the proper attitudes toward injury and illness prevention by both management and employees. A cooperative effort among employees is necessary to ensure that a safe and healthy work environment can be established and maintained. Our objective is a safety and health program that will provide a workplace with zero accidents. This safety program will include the following:
>
> A.    Conducting a program of safety and health inspections to identify and eliminate unsafe working conditions or practices; control health hazards; provide mechanical/physical safeguards, and to comply with OSHA guidelines. . . .

Ornelas agreed that, "to enforce OSHA guidelines[,] you got to know them."

Ornelas said that loaning equipment to non-employees was a "common" and "safe" practice in the industry. However, he agreed that, on January 23, 2012—five days after

10

Rosales's accident—4Front instituted a new written policy stating that "independent contractors are not to use 4Front owned equipment under any circumstances. Only [4Front] employees with the required training and/or certifications are permitted to use company owned equipment."[2] The policy further stated that "[f]uture quotes for work to be performed and work done on our premises will require that independent contractors provide their own equipment." Ornelas stated that, to his knowledge, the company did not have an informal policy to that effect prior to the accident.

With respect to the illuminated sign outside of the warehouse, Ornelas testified that he called Reyes because Reyes had done several jobs for him in the past and Ornelas was "very happy with his work." Ornelas asked Reyes to "take a look at the job and tell me what was all required and his price." Reyes "gave me the price and specifically told me: This is the price I'm going to charge you and don't rent any equipment. I'll use your equipment."

Ornelas agreed that, on the day of the accident, he knew that Reyes and Rosales would be working on the sign above the front door; that they would need lift equipment; and that Reyes had never brought lift equipment with him when he had done jobs at the facility in the past. He testified that he never spoke to Rosales before the accident. Ornelas testified:

> [Reyes] came to me, approached me and said, Hey I want to use your equipment and I said, This is the only one available right now. He said, Yep. I'll use it, I'm trained. I got experience on this, let me use that one. At that point I told my guy, Okay. Put the basket for him and leave it right there in the corner and he took it from there.

---

[2] Testimony about the January 23, 2012 policy was admitted over 4Front's counsel's objection. *See* TEX. R. EVID. 407(a) (regarding evidence of subsequent remedial measures). 4Front does not complain on appeal about the admission of this testimony.

Ornelas agreed that he authorized Reyes's use of the forklift. Ornelas did not ask Reyes to produce an OSHA certification card; according to Ornelas, that was because Reyes had informed him that he was "trained" and "experienced" in using forklifts. Ornelas conceded that, when asked at his deposition whether Rosales was responsible for his injuries, he replied "No."

Ornelas testified that Villarreal, Mujica, and Felix were not authorized to lend equipment to Reyes. Ornelas denied that Reyes asked him to rent a scissors lift to access the sign; although, on one occasion in the past, Reyes did use a scissors lift at the facility to do a different job. Ornelas stated that there were surveillance cameras in the facility, and that he could watch the live surveillance video from his office, but that the cameras were there "just in case somebody breaks in, we got some evidence for the police." He agreed that, as the person in charge of safety at the Pharr facility, he is obligated to ensure that drivers are trained and certified before they operate a forklift. He agreed that, had the equipment not been used by an uncertified and untrained operator, the accident would not have happened, but he elaborated: "You can be trained, you can be the highest scorer on the test, but the reality is that if you're not paying attention to what you're doing, regardless of how many licenses you have, the reality is obvious; what's going to happen is what happened there."

## D.    4Front Executives

The testimony of three 4Front executives was presented via video-recorded deposition excerpts. Robert Wright testified that he is 4Front's Director of Facilities and Manufacturing Engineering, and that he works at 4Front's Carrollton, Texas headquarters. He stated that 4Front has a "zero defect" policy which provides that, if any

12

employee sees equipment being used improperly or unsafely, that employee has the right to "stop it and then get a supervisor and get it resolved." He stated that he never trained Ornelas or any other 4Front employees in Pharr on OSHA regulations. When asked if he was familiar with any of the safety policies that were enforced at the Pharr facility concerning the use and operation of forklifts, Wright replied: "That's not my responsibility." He testified that each 4Front facility has its own "on-site safety representative" and that Ornelas and Robert Hawk were responsible for making sure that safety policies were enforced at the Pharr facility. Wright said that it is important for a company such as 4Front to train its workers on how to properly and safely use a forklift to prevent injury or death. He agreed that, because Reyes was not properly trained, it would have been "a violation of an important safety rule" if he were permitted to operate the forklift without being directly supervised by someone who is properly trained. Wright testified that, contrary to the warnings in the operator's manual, a forklift like the one used by Reyes and Rosales can safely be used outside, as long as it is being operated on a flat, dry surface.

Robert Hawk testified that he is the general manager of 4Front's Pharr facility. He agreed that he is Ornelas's supervisor and that he is generally responsible for ensuring that safety rules are enforced and followed at the facility. Hawk testified that it is 4Front's policy to allow forklifts to be used only by people properly trained in their use and operation. He stated: "If there's something that's obvious, that—that someone on our property is doing something incorrectly, then I think that we should probably step up to the plate and say, 'Hey, you know, you should stop doing that.' However, not everything is obvious . . . ." Hawk stated that he has never had OSHA training with respect to forklifts,

13

and neither has Ornelas. He stated that 4Front had no "explicitly stated" policy, prior to the Rosales's accident, regarding lending equipment to non-employees. He added: "There was an ad hoc verbal policy that's, 'Hey, as a general rule, it's not a good idea to do much lending of stuff to people,' because if they damage the equipment and things like that, then, you know, it costs us time and money . . . ."

Tony Koschel, 4Front's vice president of human resources, testified that he receives annual OSHA training and that it is an OSHA requirement that "all employees receive [training]." Koschel stated that it is company policy that forklift operators must be certified, and that Ornelas was responsible for supervising any employee that uses a forklift at the Pharr facility. When asked whether Ornelas had the requisite knowledge to be able to supervise employees that operate forklifts, Koschel replied: "It's an assumption that he sits in the training." He did not know that Ornelas was not certified in forklift operation. He denied that 4Front had any policy, prior to Rosales's accident, prohibiting the lending of equipment to non-employees.

Koschel agreed that, if 4Front sees an independent contractor doing something obviously dangerous, "they do have a responsibility to stop that"; and that, having loaned equipment to an independent contractor, 4Front "retain[ed] the authority" to revoke permission to use the equipment. He agreed that "it would be a good idea" to ensure that any non-employees to whom equipment may have been loaned are properly trained; but he later testified that it was not 4Front's responsibility to ensure that non-employees are properly trained.

E.    Reyes

Reyes testified, via video-recorded deposition excerpts and through an interpreter,

that he had never been trained, nor had he ever received any certification or license, to operate a forklift. He stated that Ornelas gave him permission to use the forklift involved in the accident. The following colloquy occurred:

Q. [Rosales's counsel]      Did you ask for permission to use the equipment?

A. [Reyes]      No. And I asked him if he had the other one because it was easier for you to lift up two persons instead of just one.

Q.      Did you ask him if he would rent a scissors lift?

A.      Well, he told me not to worry about the scissors lift, that he had one. But I didn't know if it was being rented or not. But it seems to me that he rented it in—for the cameras.

Q.      The scissors lift?

A.      But that's what I believe.

Q.      Did he ask you if you had any experience operating a standup lift truck?

A.      No. I told him, I can move it, but slowly.

Q.      Did you have any difficulty operating the standup lift truck inside of the warehouse?

A.      Yes.

Q.      What kind of trouble did you have?

A.      But that is why I would move it slowly.

Q.      What difficulty did you have?

A.      The thing is that this one here has a wheel that goes around like this, and it all depends on how you maneuver that wheel that, you know, it goes around. And the lever, it has the lever.

Q.      So in terms of how you moved it, that was a decision you made on your own. True?

15

. . . .

A. No.  Well, I was the one who was telling them that I needed the other one because with the other one I could lift up things, you know, up there, and regarding this one here, an operator has to be there, uh-huh, yes in case I would have any doubts or something.

Q. When you say an operator needs to be there, can you clarify what you mean?

A. Because this was the only one available that they had out there.  And what was difficult for me was this here.  And so I asked the man, I asked the one who was operating it just, you know, how to operate the joysticks.

Later, during its case-in-chief, 4Front presented additional excerpts from Reyes's deposition testimony.  Reyes stated that he has been licensed as a journeyman electrician for about three or four years.  Prior to that, he had served as an apprentice under various master electricians.  Reyes explained that he is not able to read the English language.  Every year, he is required to take a four-hour course to renew his electrician's license, but those courses are given only in English.  At the time of the deposition, his license had lapsed because he "didn't have the money to renew it."

Reyes had done two previous jobs at 4Front's Pharr warehouse, and each time he had to produce his electrician's license to the facility's manager.  Once, when he installed electric wiring for a camera system, he used a scissors lift that 4Front had rented.  Another time, he used a forklift with a platform, like the one involved in the accident at issue, to check some wires inside the warehouse; that was the first time he had operated a standing forklift.

Reyes asked Rosales to help him on the 4Front illuminated sign job because he knew him from a past job and "wanted to help him."  He stated that there was no one else

16

involved in the job, and he denied that anyone from 4Front told him how to operate the forklift. He stated that, on the first day, he operated the forklift with Rosales on the platform in order to "check out" the sign. They came back a second day because only half of the sign was lit, and that was when the accident occurred. Reyes stated that, on occasion, Rosales would ask him to lower the platform before he moved the forklift from one point to another along the front of the building, and that "I would lower it." When asked whether he lowered the platform "every time" he moved the forklift, Reyes replied: "A little."

Reyes testified that he told Ornelas that a scissors lift would be better for the job and that he asked Ornelas to rent a scissors lift for this job. When asked if there was any reason he could not have rented a scissors lift himself and brought it to the site, he replied: "Because it is very expensive."

## F.     Rosales

Rosales testified that he has not been able to work as an electrician since the accident, and he has not been able to find other work due to his injuries. He agreed that 4Front loaned the forklift involved in the accident to Reyes and himself. He agreed that, on the first day that he and Reyes worked on the illuminated sign, a person whom he believed to be "from 4Front" operated and moved the forklift, and that each time that person moved the forklift, "he lowered the platform until [the] wheels touched the sidewalk." After about three or four hours of work, Rosales thought the job was done, but only half of the sign lit up, so they had to come back the next day. On that day, Reyes operated the forklift.

Prior to the accident, he did not see Reyes do anything that would make him doubt

17

whether Reyes knew how to control the lift or its platform.  However, Reyes did not lower the platform before moving the lift back and forth.  This made Rosales feel unsafe, but he did not tell Reyes to do anything differently.

Rosales stated that he did not speak to anyone from 4Front on the day of the accident, nor did he see Reyes talk to anyone from 4Front that day.  He did not hear anyone from 4Front tell him or Reyes how to do the work.  Nevertheless, he testified that he holds 4Front—not Reyes—responsible for the accident.  He acknowledged that he had previously stated in his deposition that he faulted Reyes for failing to lower the platform before moving the lift.

## G.    Jerry Purswell

4Front's expert witness, Jerry Purswell, testified that he is a "safety engineer and ergonomics expert."  He "was head of all the standards activity at OSHA" between 1978 and 1981, and he later supervised a group in Switzerland that wrote worldwide electrical standards, though he has never been a licensed electrician.  He agreed that his degree in industrial engineering involves the study of warehouse operations, and he stated that "I have been qualified in most of the states as an accident reconstructionist where I always look at the regulations."  He stated he has analyzed "at least 20, 25" accidents involving forklifts.

Purswell stated that he analyzed Rosales's accident and reviewed the relevant regulations.  He agreed that the relevant OSHA regulation regarding electrical work states that "[i]t is the obligation of the licensee to exercise reasonable judgment and skill in the performance of all duties and work performed as a licensee."  The regulations also provide that "[t]he licensee shall not offer to perform nor perform technical services for which the

18

licensee is not qualified by education or experience without securing the services of another who is qualified."

Purswell testified that the term "employee," as used in the OSHA regulation pertaining to forklift use, does not refer to independent contractors. He stated: "[I]t wouldn't make any sense to be trying to save somebody who is an independent contractor that you don't direct their work. You don't have control over them." He elaborated:

> The employer is what the whole Occupational Safety and Health Act is addressing, is the employer and there to provide a safe and healthful workplace. There is nothing in there that's addressed to an independent contractor because they're not an employee. The person who hires them can't control them or direct how their work is done, especially to see that it's safely done.

However, later in Purswell's testimony, Rosales's counsel read OSHA's 1999 letter of interpretation regarding the pertinent regulation that was previously discussed during Spears's testimony. Purswell agreed that, according to the letter, employers are responsible for assuring that so-called "lumpers"—that is, non-employees who are invited onto the employer's property to assist in loading and unloading—"are properly trained before they are permitted to operate powered industrial trucks" on the employer's premises. He agreed that the letter does not impose an obligation on an employer to train independent contractors, "but you got to make sure [the independent contractors] know how to operate the forklift because the safety of your employees, your [ware]house employees [are] at risk because they can get hit." He specified that the letter of interpretation pertains only to independent contractors "in a warehouse setting." He agreed that, hypothetically, if he were in charge of safety at the Pharr warehouse, he would let an employee operate the forklift on the sidewalk outside of the building, but he would not let a non-employee borrow the forklift to do so.

19

In Purswell's opinion, because Reyes was the lead electrician in charge of the job, "he should not have taken into account anybody else's opinion but his own as to whether or not he could do the job safely and do it without having a hazard to the people who happen to be working with him." He stated that, if Reyes determined that he could not safely complete the job with the equipment being used, he had an obligation to notify Ornelas of that and "to go and get a safe means of elevating, of which there were obviously many available."

Purswell measured the sidewalk where the accident occurred and determined that it was free of irregularities and level to within a fraction of a degree. He testified that there was nothing about the surface of the sidewalk that would present any safety hazard regarding the use of a standing forklift with a platform. He stated that, as long as the surface was level, there was not a problem in using the forklift outdoors. He further testified that a person who is familiar with using this forklift would have "no problem" navigating the forklift around the sidewalk. He later agreed that "the use of this forklift by an uncertified, untrained worker was safe given the amount of available clearance" on either side of the lift on the sidewalk, and that the clearance on the sidewalk was "far in excess of what he would normally encounter in terms of using [the forklift] as intended to be used" within the warehouse. However, Purswell also agreed that, had Reyes been properly trained, he would have known not to move the forklift with someone on the platform and the platform in a raised position.

Purswell agreed that, if Ornelas had never given Reyes the keys to the forklift, the accident would never have happened. He said that the use of a boom lift "could have" eliminated the danger. But he opined that, because Ornelas had seen Reyes use the

20

forklift "successfully" on prior occasions, Ornelas "had no reason to believe that Mr. Reyes wouldn't be able to use this lift truck safely outside when he needed to use it." He further said it was reasonable for a warehouse manager like Ornelas to rely on representations made to him by a licensed professional tradesman, and it would not be reasonable for a warehouse manager to constantly monitor the work of an independent contractor.

According to Purswell, Reyes operated the forklift in an unsafe manner because (1) he failed to lower Rosales to the ground before moving the forklift, and (2) according to the surveillance video, Reyes was talking on his cell phone at the time the accident occurred. Purswell opined that Reyes would not need to be trained or certified to know that he should not have moved the forklift with Rosales on the platform and the platform in a raised position. He also said that Rosales's failure to "speak up and voice safety concerns" was a "substantial factor" in causing the accident.

## H. Verdict and Judgment

The jury found that the negligence of Reyes, Rosales, and 4Front each proximately caused Rosales's injuries. As to 4Front, the jury charge contained two questions asking if its negligence proximately caused Rosales's injuries—one based on a negligent entrustment theory and one based on a premises liability theory.[3] The jury answered both questions in the affirmative. The jury further found that 4Front "exercise[d] or

---

[3] Question two defined "negligence" as "entrusting the forklift to an incompetent or reckless operator, if any, if 4Front knew or should have known that the operator was incompetent or reckless." Question four stated that:

With respect to the condition of the premises, 4 Front was negligent if—

    a.    the condition posed an unreasonable risk of harm, and

    b.    [4Front] had actual knowledge of the danger, and

    c.    [4Front] failed to exercise ordinary care to protect Carlos Rosales from the danger, by both failing to adequately warn Carlos Rosales of the condition and failing to make that condition reasonably safe.

21

retain[ed] some control over the manner in which the work was performed, other than the right to order the work to start or stop or to inspect progress or receive reports." *See* TEX. CIV. PRAC. & REM. CODE ANN. ch. 95 (West, Westlaw through 2013 3d C.S.) (limiting circumstances under which commercial property owners may be held liable for acts of an independent contractor). The jury attributed 75 percent of liability to 4Front, 15 percent to Reyes, and 10 percent to Rosales. The jury also found 4Front grossly negligent and assessed $5 million in exemplary damages. *See id.* § 41.003(a)(3) (West, Westlaw through 2013 3d C.S.). Based on the jury's findings, the trial court rendered judgment that Rosales recover $7,278,317.15 in actual damages, $2,886,634.31 in exemplary damages, *see id.* § 41.008 (West, Westlaw through 2013 3d C.S.) (limiting awards of exemplary damages), and pre- and post-judgment interest from 4Front.[4] This appeal followed.

## II. DISCUSSION

### A. Evidentiary Sufficiency

We first address 4Front's evidentiary sufficiency arguments. *See Lone Star Gas Co. v. R.R. Comm'n of Tex.*, 767 S.W.2d 709, 710 (Tex. 1989) (per curiam) (noting that points calling for rendition of judgment should be considered before points calling for remand).

#### 1. Standard of Review

Evidence will be legally sufficient to support a jury's finding unless the record reveals: (1) the complete absence of evidence of a vital fact; (2) that the court is barred

---

[4] The final judgment also assessed actual damages of $1,213,052.86, plus interest, against Reyes. It ordered 4Front jointly and severally liable for this amount, and this was included in the amount assessed as actual damages against 4Front as set forth above. Reyes is not a party to this appeal.

by the rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) that the evidence offered to prove a vital fact is no more than a scintilla; or (4) that the evidence establishes conclusively the opposite of a vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005). We view the evidence in the light most favorable to the finding, crediting favorable evidence if a reasonable fact-finder could and disregarding contrary evidence unless a reasonable factfinder could not. *Id.* at 807. The ultimate test for legal sufficiency is whether the evidence would enable reasonable and fair-minded people to make the finding under review. *Id.* at 827. In reviewing a legal sufficiency issue, the court indulges every reasonable inference in support of that finding. *Id.* at 822.

"Jurors are the sole judges of the credibility of the witnesses and the weight to give their testimony. They may choose to believe one witness and disbelieve another. Reviewing courts cannot impose their own opinions to the contrary." *Id.* at 819. "Courts reviewing all the evidence in a light favorable to the verdict thus assume that jurors credited testimony favorable to the verdict and disbelieved testimony contrary to it." *Id.*

In reviewing a factual sufficiency challenge to a jury finding on issues on which the appellant did not have the burden of proof, as is the case here, we set aside the verdict only if the evidence that supports the jury finding is so weak as to make the verdict clearly wrong and manifestly unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam); *Ins. Network of Tex. v. Kloesel*, 266 S.W.3d 456, 469–70 (Tex. App.—Corpus Christi 2008, pet. denied). In a factual sufficiency review, we consider and weigh all the evidence, but as in a legal sufficiency review, we defer to the jury as the sole judge of the witnesses' credibility. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001); *see*

*Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003). The jury may choose to believe one witness over another, and a reviewing court may not impose its own opinion to the contrary. *Golden Eagle Archery*, 116 S.W.3d at 761.

### 2. Chapter 95

4Front argues by its second issue that the evidence was legally and factually insufficient to support the jury's answer, in response to jury charge questions three and four, respectively, that 4Front "exercise[d] or retain[ed] some control over the manner in which the work was performed" and had "actual knowledge of the danger" posed by a condition on the premises. The charge questions were based on chapter 95 of the Texas Civil Practice and Remedies Code, which provides:

> A property owner is not liable for personal injury, death, or property damage to a contractor, subcontractor, or an employee of a contractor or subcontractor who constructs, repairs, renovates, or modifies an improvement to real property, including personal injury, death, or property damage arising from the failure to provide a safe workplace unless:
>
> (1) the property owner exercises or retains some control over the manner in which the work is performed, other than the right to order the work to start or stop or to inspect progress or receive reports; and
>
> (2) the property owner had actual knowledge of the danger or condition resulting in the personal injury, death, or property damage and failed to adequately warn.

TEX. CIV. PRAC. & REM. CODE ANN. § 95.003. The statute is applicable only to a claim:

> (1) against a property owner, contractor, or subcontractor for personal injury, death, or property damage to an owner, a contractor, or a subcontractor or an employee of a contractor or subcontractor; and
>
> (2) that arises from the condition or use of an improvement to real property where the contractor or subcontractor constructs, repairs, renovates, or modifies the improvement.

24

*Id.* § 95.002. "Claim" is defined in chapter 95 as "a claim for damages caused by negligence." *Id.* § 95.001(1). "Property owner" is defined as "a person or entity that owns real property primarily used for commercial or business purposes." *Id.* § 95.001(3).[5]

As a threshold matter, we consider whether chapter 95 applies to Rosales's claims. In response to 4Front's second issue, Rosales argues that the statute does not apply because his claim did not "arise[] from the condition or use of an improvement to real property." *See id.* § 95.002(2). He further contends that the statute is inapplicable because "[t]his is a negligent activity case," not a premises liability case.

In support of his argument, Rosales points to *Keetch v. Kroger Co.*, in which the Texas Supreme Court explained the difference between premises liability and negligent activity cases. *See* 845 S.W.2d 262, 264 (Tex. 1992). As the supreme court stated, "[r]ecovery on a negligent activity theory requires that the person have been injured by or as a contemporaneous result of the activity itself rather than by a condition created by the activity," whereas a premises liability claim requires, among other things, a showing that the property owner had actual or constructive knowledge of an unreasonable risk of harm and failed to use reasonable care to reduce or eliminate the risk. *Id.*; *see Del Lago Partners, Inc. v. Smith*, 307 S.W.3d 762, 778 (Tex. 2010) ("We have recognized that

---

[5] Before the adoption of chapter 95, a Texas property owner was generally not liable for injuries sustained by an independent contractor because the property owner had no duty to see that an independent contractor performed his work in a safe manner. *Redinger v. Living, Inc.*, 689 S.W.2d 415, 418 (Tex. 1989) (citing *Abalos v. Oil Dev. Co.*, 544 S.W.2d 627, 631 (Tex. 1976)). In *Redinger*, the Texas Supreme Court adopted section 414 of the Restatement (Second) of Torts, which provides an exception to this general rule in situations where a premises owner or a general contractor exercises some control over the work of a subcontractor or an independent contractor. *Id.* Chapter 95 codified *Redinger*'s requirement that, as a prerequisite to liability, a property owner must exercise or retain some control over the manner in which the work is performed. *See id.*; *see also* TEX. CIV. PRAC. & REM. CODE ANN. § 95.003 (West, Westlaw through 2013 3d C.S.). Section 95.003 further limited a property owner's liability by requiring a plaintiff to prove that the owner had actual knowledge—not merely constructive knowledge—of a dangerous condition on the premises. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 95.003; *Elmgren v. Ineos USA, LLC*, 431 S.W.3d 657, 662 (Tex. App.—Houston [14th Dist.] 2014, pet. filed).

negligent activity encompasses a malfeasance theory based on affirmative, contemporaneous conduct by the owner that caused the injury, while premises liability encompasses a nonfeasance theory based on the owner's failure to take measures to make the property safe."). The *Keetch* Court found that the claim at issue there—a slip and fall at a grocery store—was not a negligent activity case because, although "[a]t some point, almost every artificial condition can be said to have been created by an activity," there was "no ongoing activity" at the time the plaintiff was injured. 845 S.W.2d at 264. Rosales also cites several cases in which courts have held that an independent contractor's workplace injury claim was not properly characterized as a premises liability claim. *See Redinger v. Living, Inc.*, 689 S.W.2d 415, 417 (Tex. 1985) (plaintiff subcontractor was injured when another subcontractor crushed plaintiff's finger while moving dirt, as ordered by the defendant general contractor, with his tractor; supreme court held "[t]his is not a premises defect case . . . [r]ather, this case involves an injury caused by an activity conducted on the premises"); *Saenz v. David & David Constr. Co.*, 52 S.W.3d 807, 811 (Tex. App.—San Antonio 2001, no pet.) (subcontractor was hit and knocked off a roof by panels being lifted to the roof by a crane operated by another subcontractor; court held that trial court did not err in refusing to submit premises liability question); *Arias v. MHI P'ship Ltd.*, 978 S.W.2d 660, 662 (Tex. App.—Corpus Christi 1998, no pet.) (plaintiff, an employee of an independent contractor hired by the defendant, fell while doing framing work; we held "[t]his is not a premises defect case" because "it involves an injury caused by an activity conducted on the premises").

4Front urges that the case is instead controlled by *Coastal Marine Service of Texas, Inc. v. Lawrence*, 988 S.W.2d 223 (Tex. 1999). In that case, an independent

contractor's employee was killed when his head was crushed in the "pinch point" area of a crane. *Id.* at 224. The crane was owned by the defendant, but the contractor "took custody of the crane and began continued occupation of [the defendant]'s property" two years before the accident. *Id.* The defendant was not involved in directing or supervising the contractor's work and had no employees on the job site when the accident occurred. *Id.* at 225. The Texas Supreme Court rendered judgment against the plaintiffs because there was no evidence that the defendant retained or exercised a "right to control" the subcontractor's work. *Id.*[6]

We agree with Rosales that, according to its strictly-construed plain meaning, chapter 95 does not apply to this case. *See Smith v. Sewell*, 858 S.W.2d 350, 354 (Tex. 1993) (noting that, if a statute "deprives a person of a common-law right," it "will be strictly construed in the sense that it will not be extended beyond its plain meaning or applied to cases not clearly within its purview"); *see also Carpenter v. First Tex. Bancorp*, No. 03-12-00004-CV, 2014 WL 2568494, at *1 (Tex. App.—Austin June 5, 2014, no pet.) (mem. op.) (construing chapter 95 strictly pursuant to *Smith*). Rosales was injured while in the process of repairing an improvement to 4Front's real property—the illuminated sign—but it cannot be said that his claim "ar[o]se[] from the condition or use" of the sign. *See* TEX.

_____

[6] At oral argument, 4Front asserted that Rosales's characterization of his claim as a "negligent activity" claim is incorrect in part because a "negligent activity" claim differs from a "negligent entrustment" claim, and the former theory was not submitted to the jury. In fact, a "negligent activity" claim, as defined by the case law, appears to be any negligence claim made against a landowner that is not based on a premises liability theory. *See Timberwalk Apartments, Partners, Inc. v. Cain*, 972 S.W.2d 749, 753 (Tex. 1998) ("Negligence in the [context of a negligent activity claim] means simply doing or failing to do what a person of ordinary prudence in the same or similar circumstances would have not done or done."); *E.I. DuPont de Nemours & Co. v. Roye*, 447 S.W.3d 48, 56 (Tex. App.—Houston [14th Dist.] 2014, pet. filed) ("Under Texas law, a person injured on another's property has two potential causes of action against the owner of the property: (1) a negligence claim for negligent activity on the premises, and (2) a premises liability claim for an unreasonably dangerous condition on the premises."); *Elmgren*, 431 S.W.3d at 669 (noting that negligent activity "is a general negligence cause of action"). Here, the "negligent activity" alleged by Rosales is the negligent entrustment of the forklift to Reyes, which was submitted to the jury in charge question two.

CIV. PRAC. & REM. CODE ANN. § 95.003.  Rather, his claims arose from the use of a forklift, which is not an improvement to real property.[7]  Moreover, we find that the instant case is more akin to those cited by Rosales than to *Coastal Marine*.  *Redinger*, *Saenz*, and *Arias* each involved claims by independent contractors for injuries resulting from activities, not from pre-existing defects on the premises which the property owner failed to reasonably warn about or correct.  *See Redinger*, 689 S.W.2d at 417; *Saenz*, 52 S.W.3d at 811; *Arias*, 978 S.W.2d at 662.  Similarly, here, Rosales's claim is based on activities—his injuries would not have occurred if Ornelas had not loaned the forklift to Reyes and had Reyes not driven the forklift off the sidewalk.  The injury here was the "contemporaneous result of an activity" and was not the result of an unreasonable risk of harm due to unsafe conditions on the premises which 4Front failed to reduce or eliminate.  *See Del Lago Partners*, 307 S.W.3d at 788 ("In short, unlike a negligent activity claim, 'a premises defect

---

[7] In *Hernandez v. Brinker International, Inc.*, the Fourteenth Court of Appeals held that,

> pursuant to the plain language of section 95.002(2), Chapter 95 does not apply to a contractor's employee's claim against a property owner when the improvement the condition or use of which gives rise to the injury claim is not the same improvement the contractor was at the premise to address at the time of injury.

285 S.W.3d 152, 157 (Tex. App.—Houston [14th Dist.] 2009, no pet.).  Here, even if the forklift were considered an improvement to real property, the forklift was not the *particular* improvement to real property that Reyes and Rosales were hired to repair; so chapter 95 would not apply under the rationale set forth in *Hernandez.*

*Hernandez*, however, has been disavowed by other Texas appeals courts.  *See Covarrubias v. Diamond Shamrock Ref. Co.*, L.P. 359 S.W.3d 298, 301–02 (Tex. App.—San Antonio 2012, no pet.) ("[C]hapter 95 applies even if the contractor's employee was injured by an improvement separate from the improvement the employee was on the premises to repair."); *Gorman v. Ngo*, 335 S.W.3d 797, 805 (Tex. App.—Dallas 2011, no pet.) (stating that *Hernandez* "appears to be a departure from the existing case law of other intermediate courts of appeals"); *Painter v. Momentum Energy Corp.*, 271 S.W.3d 388, 398 (Tex. App.—El Paso 2008, pet. denied) ("[C]hapter 95 applies, despite the fact that the object causing the injury is not itself an improvement, where the injury arises from work being done on an improvement."); *Fisher v. Lee & Chang P'ship*, 16 S.W.3d 198, 201 (Tex. App.—Houston [1st Dist.] 2000, pet. denied) (stating that chapter 95 "does not require that the defective condition be the object of the contractor's work").

We need not decide whether to follow *Hernandez*'s narrow reading of chapter 95 here because, even if we did not, chapter 95 would still be inapplicable to Rosales's claims as those claims did not arise out of a "condition or use" of any improvement to real property.  *See* TEX. CIV. PRAC. & REM. CODE ANN. § 95.003(2).

claim is based on the property itself being unsafe.'") (quoting *State v. Shumake*, 199 S.W.3d 279, 284 (Tex. 2006)); *Keetch*, 845 S.W.2d at 264. *Coastal Marine* is distinguishable because, in that case, there was no evidence that the property owner's employees directed, supervised, or were even present at the job site at the time of the injury.[8] *See* 8 S.W.2d at 224–25.

As noted above, 4Front contends by its second issue that the evidence is legally and factually insufficient to show that it had "actual control" or "actual knowledge of a danger" as required for liability under chapter 95 and as set forth in jury charge questions three and four. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 95.003. However, we have already concluded that chapter 95 does not apply to Rosales's claims. In any event, we need not address this contention because of our finding below that the jury's verdict was supported on a negligent entrustment theory as set forth in charge question two. *See* TEX. R. APP. P. 47.1. 4Front's second issue is overruled.

### 3. Negligent Entrustment

4Front's third issue challenges the legal and factual sufficiency of the evidence supporting the jury's findings as to negligent entrustment in its answer to jury charge question two.

---

[8] *Coastal Marine* is also distinguishable in that it did not apply chapter 95 because the claims brought in that case arose prior to the effective date of the statute. *See* Act of May 18, 1995, 74th Leg., R.S., ch. 136, § 4, 1995 TEX. SESS. LAW SERV. 976 (stating that chapter 95 applies only to claims accruing on or after September 1, 1996); *see also Coastal Marine Serv. of Tex., Inc. v. Lawrence*, 988 S.W.2d 223, 224–26 (Tex. 1999). Instead, it applied the predecessor common law doctrine—which did not include the requirement found in chapter 95 that a claim "arise[] from the *condition or use* of an improvement to real property." *See id.*; *see also* TEX. CIV. PRAC. & REM. CODE ANN. § 95.002(2) (West, Westlaw through 2013 3d C.S.) (emphasis added). Rather, that doctrine applied more generally to claims based on any "dangerous condition [that] arises as a result of the independent contractor's work activity." *Coastal Marine*, 988 S.W.2d at 225. Accordingly, the supreme court's decision to apply the common law doctrine in *Coastal Marine* does not compel a finding that Rosales's claims fall under the purview of chapter 95.

29

We first address 4Front's contention, also made as part of its third issue, that "[t]here is no cause of action in Texas for negligent entrustment of a forklift." 4Front argues that "[n]o Texas case establishes a cause of action for negligent entrustment of a forklift" and "Texas appellate courts have only expanded the doctrine in the case of firearms." *See Kennedy v. Baird*, 682 S.W.2d 377, 378–79 (Tex. App.—El Paso 1984, no writ).

As 4Front correctly notes, liability for negligent entrustment is most often alleged in suits arising out of motor vehicle accidents. *See Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 758 (Tex. 2007). A forklift is a motor vehicle. Rosales concedes that Texas courts have not addressed whether liability may arise from the negligent entrustment of an industrial vehicle such as a forklift; however, by the same token, 4Front has directed us to no authority indicating that such liability should not or may not be extended beyond the context of personal-use vehicles or firearms. Instead, we believe the principles underlying negligent entrustment liability are squarely applicable to Rosales's claim. Negligent entrustment is founded on section 390 of the Restatement (Second) of Torts, which states:

> One who supplies directly or through a third person a chattel for the use of another whom the supplier knows or has reason to know to be likely because of his youth, inexperience, or otherwise, to use it in a manner involving unreasonable risk of physical harm to himself and others whom the supplier should expect to share in or be endangered by its use, is subject to liability for physical harm resulting to them.

RESTATEMENT (2D) OF TORTS § 390 (1965); *see Mayes*, 236 S.W.3d at 758; *see also Donahue v. Polaris Indus., Inc.*, No. 02-11-00279-CV, 2012 WL 1034908, at *4 (Tex. App.—Fort Worth Mar. 29, 2012, pet. denied) (mem. op.) ("[T]here is no articulable distinction between section 390 and negligent entrustment."). "Chattel" is defined as

"[m]ovable or transferable property; personal property; esp[ecially], a physical object capable of manual delivery and not the subject matter of real property." BLACK'S LAW DICTIONARY 268 (9th ed. 2009). A forklift fits within this definition. Moreover, in recognizing that liability may attach to the negligent entrustment of a firearm, the El Paso Court of Appeals observed:

> The establishment of the negligent entrustment of an automobile theory of recovery was developed by the courts because of the realization that one who entrusts an automobile to another owes a duty to the general public not to be negligent in such entrustment. An automobile when in the hands of one who is not competent to handle it becomes a threat to the general public, and the owner of the automobile who is negligent in the entrustment should be liable to the injured party provided that causation can be shown. The owner's liability does not arise out of a vicarious relationship, rather it arises out of the negligence of the owner in entrusting the automobile to another.

*Kennedy*, 682 S.W.2d at 378. The unanimous trial testimony established that a forklift, like a firearm, is also a machine which "when in the hands of one who is not competent to handle it becomes a threat to the general public." *Id.* We are aware of no reason to limit the applicability of negligent entrustment liability to the personal-use vehicle or firearm context. For the foregoing reasons, we reject 4Front's contention that the cause of action is not cognizable.

Having found that negligent entrustment of a forklift is a viable cause of action, we further conclude that the evidence adduced at trial was sufficient, both legally and factually, to support the jury's finding of liability on this theory. To establish liability under a negligent entrustment theory, Rosales was required to establish that (1) 4Front entrusted the forklift to Reyes; (2) Reyes was an unlicensed, incompetent, or reckless forklift operator; (3) at the time of the entrustment, 4Front should have known that Reyes was an unlicensed, incompetent, or reckless forklift operator; (4) Reyes was negligent on

31

the occasion in question; and (5) Reyes's negligence proximately caused the accident. *See Mayes*, 236 S.W.3d at 758; *Schneider v. Esperanza Transmission Co.*, 744 S.W.2d 595, 596 (Tex. 1987). 4Front does not dispute that the first, second, fourth, and fifth elements were established by sufficient evidence. As to the third element—whether 4Front should have known at the time of the entrustment that Reyes was unlicensed, incompetent or reckless—we find that a reasonable juror could have reached an affirmative conclusion based on the evidence adduced at trial. Ornelas, the 4Front employee responsible for safety at the Pharr facility, testified that he knew that the forklift operating manual states repeatedly that the forklift should only be used by a licensed, trained operator, and that it should only be used indoors. He agreed that he was obligated to ensure that drivers are trained and certified before they operate a forklift. He did not, however, ask Reyes to produce an OSHA certification card or other proof that Reyes was trained before he loaned the forklift to Reyes. Although Ornelas testified that Reyes had previously used the forklift without incident, much of that use occurred indoors where the danger was not as severe. Both expert witnesses testified that, under the 1999 OSHA interpretation letter introduced into evidence, warehouse operators must ensure that forklift operators are properly trained. Koschel, 4Front's vice president for human resources, testified that all 4Front employees must receive OSHA training, but it is undisputed that Ornelas did not receive such training. We conclude that, from this evidence, a reasonable juror could have concluded that Ornelas "should have known," at the time he loaned the forklift to Reyes, that Reyes was an unlicensed or incompetent forklift operator. *See Mayes*, 236 S.W.3d at 758

32

4Front's third issue is overruled.[9]

### 4. Causation

By its fourth issue, 4Front contends the evidence was legally and factually insufficient to show that its negligence was a proximate cause of Rosales's injuries, as found by the jury in response to charge questions two and four.

Proximate cause has two components: (1) foreseeability and (2) cause-in-fact. *Rodriguez-Escobar v. Goss*, 392 S.W.3d 109, 113 (Tex. 2013); *see Del Lago Partners*, 307 S.W.3d at 774. Foreseeability requires that a person of ordinary intelligence should have reasonably anticipated the danger created by a negligent act or omission. *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 478 (Tex. 1995); *J.P. Morgan Chase Bank, N.A. v. Tex. Contract Carpet, Inc.*, 302 S.W.3d 515, 533 (Tex. App.—Austin 2009, no pet.). Foreseeability is not measured by hindsight, but instead by what the actor knew or should have known at the time of the alleged negligence. *Boren v. Texoma Med. Ctr., Inc.*, 258 S.W.3d 224, 230 (Tex. App.—Dallas 2008, no pet.). Foreseeability requires only that the general danger, not the exact sequence of events that produced the harm, be foreseeable. *Timberwalk Apartments Partners, Inc. v. Cain*, 972 S.W.2d 749, 756, 757 (Tex. 1998). For a negligent act or omission to have been a cause-in-fact of the harm, the act or omission must have been a substantial factor in bringing about the harm, and absent the act or omission—i.e., but for the act or omission—the harm would not have occurred. *Rodriguez-Escobar*, 392 S.W.3d at 113. If the defendant's negligence merely furnished a condition that made the injuries possible, there can be no cause in

---

[9] 4Front also contends by its third issue that the negligent entrustment jury question should not have been submitted because "Chapter 95 provides the exclusive remedy in this case." We address this argument *infra* section B.

33

fact. *W. Invs., Inc. v. Urena*, 162 S.W.3d 547, 551 (Tex. 2005). There may be more than one proximate cause of an occurrence. *Del Lago Partners*, 307 S.W.3d at 774.

4Front contends that the accident that injured Rosales was "unforeseeable given Reyes's prior work history and statements that he could operate the lift slowly." We disagree. Trial testimony established that Ornelas instructed his staff to loan the forklift to Reyes and that Ornelas knew Reyes was going to use the forklift on the sidewalk below the illuminated sign. Spear testified that he would not have allowed anyone to use a standing forklift for that particular job because there was insufficient clearance on the sidewalk. Purswell testified that there was sufficient clearance, and that there was nothing about the sidewalk that would make it inherently unsafe for forklift operation, but the jury was entitled to reject that testimony and instead believe Spear. *See City of Keller*, 168 S.W.3d at 819. Moreover, Reyes testified that Ornelas did not ask him whether he had experience operating that type of vehicle, and that he told Ornelas that a scissors lift would be better for the job. Again, although Ornelas's testimony conflicted with that of Reyes, the jury was entitled to resolve that conflict. *See id.* From this evidence, the jury could have reasonably concluded that a person of ordinary intelligence would have anticipated that an injury would likely result from lending the forklift to Reyes to fix the sign. *See Boys Clubs*, 907 S.W.2d at 478. Additionally, Purswell agreed that the accident would have never happened if Ornelas had never given Reyes the keys to the forklift, and Reyes testified that he could not have rented a scissors lift himself and brought it to the worksite "[b]ecause it is very expensive." From this evidence, the jury could have reasonably concluded that 4Front's negligence was a cause-in-fact of Rosales's injuries. *See Rodriguez-Escobar*, 392 S.W.3d at 113. We overrule 4Front's fourth issue.

34

## 5.    Gross Negligence

By its fifth issue, 4Front contends that the evidence was legally and factually insufficient to support the jury's finding that 4Front was grossly negligent.

In general, exemplary damages may be awarded if the plaintiff proves that the harm suffered resulted from gross negligence.  *See* TEX. CIV. PRAC. & REM. CODE ANN. § 41.004(a)(3) (West, Westlaw through 2013 3d C.S.).  "Gross negligence" means an act or omission:

> (A)    which when viewed objectively from the standpoint of the actor at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and
>
> (B)    of which the actor has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others.

*Id.* § 41.001(11) (West, Westlaw through 2013 3d C.S.).  Under the objective element, an extreme risk is "not a remote possibility of injury or even a high probability of minor harm, but rather the likelihood of serious injury to the plaintiff."  *Boerjan v. Rodriguez*, 436 S.W.3d 307, 311 (Tex. 2014).  Under the subjective element, "actual awareness means the defendant knew about the peril, but its acts or omissions demonstrated that it did not care."  *Id.*  Circumstantial evidence may suffice to prove either element.  *Id.*

Gross negligence must be proven by clear and convincing evidence.  TEX. CIV. PRAC. & REM. CODE ANN. § 41.003(a)(3).  "'Clear and convincing' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established."  *Id.* § 41.001(2); *U-Haul Int'l, Inc. v. Waldrip*, 380 S.W.3d 118, 137 (Tex. 2012).  Because of this heightened burden of proof, we apply a heightened standard of review:

35

In a legal sufficiency review, a court should look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. To give appropriate deference to the factfinder's conclusions and the role of a court conducting a legal sufficiency review, looking at the evidence in the light most favorable to the judgment means that a reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. A corollary to this requirement is that a court should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. This does not mean that a court must disregard all evidence that does not support the finding. Disregarding undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence.

*Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue*, 271 S.W.3d 238, 248 (Tex. 2008) (quoting *Diamond Shamrock Ref. Co., L.P. v. Hall*, 168 S.W.3d 164, 170 (Tex. 2005)); *see Sw. Bell Tel. Co. v. Garza*, 164 S.W.3d 607, 627 (Tex. 2004) (noting that "whenever the standard of proof at trial is elevated, the standard of appellate review must likewise be elevated"). We review all the evidence to determine whether the jury could have formed a firm belief or conviction that 4Front's conduct deviated so far from the standard of care as to create an extreme risk and that 4Front was subjectively aware of, but consciously indifferent to, this risk. *See id.*

We first address the subjective element of gross negligence because it is dispositive. Rosales contends that the subjective element was supported by evidence showing that Ornelas "made [Reyes and Rosales] use the wrong equipment actually knowing where they were going to use it, and what they were going to try to do with it"; that 4Front "knew its own employees had to be properly trained and certified to operate the forklift"; and that Ornelas "controlled the choice of equipment even to the extent that if Reyes had shown up with a scissor[s] lift, he could not have used it without permission from Ornelas." Rosales cites *Lee Lewis Construction, Inc. v. Harrison*, in which the Texas Supreme Court found legally sufficient evidence of gross negligence in a case involving

36

the death of a subcontractor's employee at a construction site. 70 S.W.3d 778, 786 (Tex. 2001). Specifically with regard to the subjective element of gross negligence, the *Lee Lewis* Court cited testimony by the defendant general contractor's job superintendent that he saw subcontractor employees working from windowsills despite using only "safety belts and lanyards, without safe work platforms or independent lifelines," which he knew was ineffective for the prevention of falls. *Id.* He admitted that, even after he observed the subcontractor employees using the ineffective fall-protection system, "he did nothing to remedy it." *Id.* Additionally, the subcontractor's foreman testified that the job superintendent approved of the inadequate safety system, and evidence showed that the general contractor's employees "did use independent lifelines as part of their fall-protection equipment" even though the subcontractor's employees did not. *Id.* The supreme court held that all of this evidence was sufficient to support the jury's finding that the general contractor "knew of, but was consciously indifferent to, the risk of fatal falls for its subcontractors' employees." *Id.*

Here, the evidence appears to be undisputed that Ornelas was never trained in forklift use. There was evidence that there were surveillance cameras in Ornelas's office which would have shown Rosales and Reyes as they were attempting to fix the illuminated sign, and there was evidence that Ornelas may have been able to view Rosales and Reyes working through a window in his office, but there was no evidence that Ornelas actually knew that Rosales was operating the forklift unsafely, such as by moving the forklift with the platform raised. Evidence showed that, in fact, Reyes had used a similar forklift inside the Pharr facility on a previous occasion without incident. Ornelas testified that he was aware of the OSHA regulations regarding forklift use prior

37

to the accident, but there is a dispute regarding whether those regulations apply to non-employees. Even if they did apply to non-employees, there is no evidence that Ornelas actually knew that Reyes was uncertified and untrained; Ornelas testified that Reyes told him he was "trained" and "experienced" in using forklifts.

Under these circumstances, we find that the evidence—though legally sufficient to establish 4Front's negligence—could not have allowed a reasonable juror to form a firm belief or conviction that 4Front "knew about the peril, but its acts or omissions demonstrated that it did not care." *See Boerjan*, 436 S.W.3d at 311; *Hogue*, 271 S.W.3d at 248. Unlike in *Lee Lewis*, there was no testimony that any 4Front representative had actual knowledge that Reyes was incompetent to operate the forklift or that he was operating the forklift improperly. *See* 70 S.W.3d at 786. The evidence supported a finding that Ornelas *should have* known that Reyes was an incompetent forklift operator, but the evidence did not support a finding that Ornelas *actually* knew that. Instead, the evidence established that Ornelas simply lacked the knowledge and training necessary to properly ensure that forklifts were used safely at the Pharr facility. Accordingly, we conclude that the evidence was legally insufficient to establish the subjective element of gross negligence.[10]

The award of exemplary damages was error. *See Safeshred, Inc. v. Martinez*, 365 S.W.3d 655, 666 (Tex. 2012) (holding that "the exemplary damages award must be

---

[10] Because we find that the evidence was legally insufficient to establish the subjective element of gross negligence, we need not consider whether the evidence was factually sufficient to support that element, nor need we consider whether the evidence was sufficient to establish the objective element. See TEX. CIV. PRAC. & REM. CODE ANN. § 41.001(11) (West, Westlaw through 2013 3d C.S.) (requiring that both subjective and objective elements be satisfied in order to prove gross negligence); TEX. R. APP. P. 47.1.

38

reversed" because there was insufficient evidence of malice). 4Front's fifth issue is sustained.

### 6. Comparative Responsibility

By its seventh issue, 4Front argues that the evidence was factually insufficient to support the jury's finding as to comparative responsibility. As noted, the jury found 4Front 75 percent liable, Reyes 15 percent liable, and Rosales 10 percent liable. We have already found that the evidence was sufficient to support a finding that 4Front was liable on a negligent entrustment theory. And, under such a theory, the entrustor is liable for the acts of the entrustee, without regard to the degree of negligence of the entrustor itself. *See F.F.P. Operating Partners, L.P. v. Duenez*, 237 S.W.3d 680, 698 (Tex. 2007) ("Once negligent hiring or entrustment is established, the owner/employer is liable for the acts of the driver, and the degree of negligence of the owner/employer is of no consequence.") (quoting *Rosell v. Cent. W. Motor Stages, Inc.*, 89 S.W.3d 643, 657 (Tex. App.—Dallas 2002, pet. denied)).[11] Here, there is no dispute that the entrustee—Reyes—was negligent in his operation of the forklift at the time of the accident, and that his negligence contributed significantly to Rosales's injuries. Moreover, the evidence established that 4Front was in a superior position to be aware of proper forklift safety procedures than either Reyes or Rosales. As Rosales notes, 4Front is "the only party that was actually in the forklift safety business." Ornelas testified that forklift operation constitutes a "very

---

[11] In *F.F.P. Operating Partners, L.P. v. Duenez*, the supreme court held that, in negligent entrustment cases, when "the entrustor's share of responsibility is merely a 'subpart' of the entrustee's share, then the entrustor should not be submitted separately [in the apportionment question]." 237 S.W.3d 680, 698 (Tex. 2007). "Only the entrustee should be submitted, and his or her negligence would then be imputed to the entrustor as a matter of law." *Id.* Here, both the entrustor (4Front) and the entrustee (Reyes) were submitted in the comparative responsibility question. However, 4Front does not argue on appeal that the comparative responsibility question was defective for this reason. Therefore, we do not address the issue.

large part of what [we] do" at the Pharr facility and that forklifts were used there on a daily basis. Finally, although his testimony was disputed, Reyes stated that he told Ornelas that a scissors lift would be better for the job and that he asked Ornelas to rent a scissors lift for this job, but Ornelas declined. In light of this evidence, we cannot say that the jury's comparative responsibility findings were supported only by evidence "so weak as to make the verdict clearly wrong and manifestly unjust." *See Cain*, 709 S.W.2d at 176. 4Front's seventh issue is overruled.

## B. Jury Charge Error

4Front's raises two issues regarding jury charge error. We review alleged jury charge error for abuse of discretion. *Tex. Dep't of Human Servs. v. E.B.*, 802 S.W.2d 647, 649 (Tex. 1990). A court abuses its discretion in connection with the charge and commits reversible error only if the error probably caused the rendition of an improper judgment or probably prevented the appellant from properly presenting the case on appeal. TEX. R. APP. P. 44.1(a)(1); *Romero v. KPH Consol., Inc.*, 166 S.W.3d 212, 225 (Tex. 2005).

We first address issue six, which contends that the broad-form jury charge question regarding comparative responsibility should not have been submitted because the two liability questions—based on negligent entrustment and premises liability theories, respectively—were improperly submitted. Instead, 4Front contends that two separate comparative responsibility questions, one based on each theory of liability, should have been submitted.[12]

---

[12] 4Front did not submit proposed comparative responsibility questions in writing. However, 4Front's counsel objected to the single comparative responsibility question on the basis that it "improperly combines two invalid theories." Counsel also stated that "[t]he only solution would be to ask separate responsibility questions," but the trial court rejected that solution. Because the comparative responsibility

40

4Front relies on *Romero*, in which an apportionment of responsibility question was found to have been erroneously submitted because it encompassed two theories of negligence, one of which was based on legally insufficient evidence. 166 S.W.3d at 224–27 (citing *Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 381 (Tex. 2000) (holding that "submitting invalid theories of liability in a single broad-form jury question is harmful error when it cannot be determined whether the jury based its verdict on one or more of the invalid theories")).[13] The *Romero* Court stated that jury charge error in this regard is reversible unless the appellate court is "reasonably certain that the jury was not significantly influenced by issues erroneously submitted to it." *Id.* at 227–28.

Here, the comparative responsibility question, question five of the jury charge, stated: "For each person you found in your answer to Question Nos. 1, 2, or 4 to have caused or contributed to cause the occurrence in question, find the percentage of responsibility attributable to each." Question one of the jury charge asked whether Reyes and Rosales were negligent; question two asked if 4Front was liable under a negligent entrustment theory; and question four asked if 4Front was liable under a premises liability theory.

---

question was "relied upon" by Rosales, we conclude that 4Front's verbal objection was sufficient to preserve the issue for appeal. *See* TEX. R. CIV. P. 278 ("Failure to submit a question shall not be deemed a ground for reversal of the judgment, unless its submission, in substantially correct wording, has been requested in writing and tendered by the party complaining of the judgment; provided, however, that *objection to such failure shall suffice in such respect if the question is one relied upon by the opposing party*.") (emphasis added).

[13] The charge question at issue in *Romero* was: "What percentage of the conduct that caused the occurrence or injury do you find to be attributable to each of those found by you, in your answer to Question No. 1 and/or 2 to have caused the occurrence of injury?" *Romero v. KPH Consol., Inc.*, 166 S.W.3d 212, 225 (Tex. 2005).

41

Assuming, but not deciding, that the evidence was insufficient to support the jury's answer to the premises liability question,[14] we are nevertheless "reasonably certain" that the jury was not "significantly influenced" by the submission of that question in determining comparative responsibility. *See id.* In *Romero*, the liability theory which was found to be supported by insufficient evidence was based on malicious credentialing; the other theory, which was supported by evidence, was based on general negligence. *See id.* at 219. The general negligence theory, however, was based on different facts than the malicious credentialing theory—the former was based on the alleged failure of the defendant hospital to timely provide a blood transfusion during surgery, whereas the latter was based on the hospital's decision to hire the surgeon that performed the surgery, who previously had numerous malpractice suits filed against him. *Id.* at 216. The supreme court found that there was no evidence of malice, so the malicious credentialing question was erroneously submitted. *Id.* at 220. It further found that the submission of a broad-form comparative responsibility question was reversible error because "the jury could not conceivably have ignored [the malicious credentialing] finding in apportioning responsibility." *Id.* Here, on the other hand, Rosales's premises liability and negligent entrustment theories were based on the same action allegedly taken by 4Front—i.e., lending the forklift to Reyes to use to repair the illuminated sign. The parties dispute whether those facts support a premises liability claim or a negligent activity claim as a matter of law, but the two theories are not based on different alleged acts of negligence as in *Romero*. *See id.* Because the two theories were based on the same underlying factual allegations, we do not believe that the submission of a separate comparative

---

[14] We have already concluded that the jury's answer to the negligent entrustment question was supported by sufficient evidence. *See supra* § II.A.3.

responsibility question based only on negligent entrustment would have resulted in a significantly lower apportionment of responsibility to 4Front, even if the premises liability question was improperly submitted.[15]  *See id.* at 227 (noting that "[w]e do not hold that the error of including a factually unsupported claim in a broad-form jury question is always reversible" and that, in some instances, "a jury may simply ignore a factor in the charge that lacks evidentiary support").  We overrule 4Front's sixth issue.

4Front further contends by part of its third issue that jury charge question two, regarding negligent entrustment, should not have been submitted "because, as a matter of law, Chapter 95 provides the exclusive remedy in this case."  We disagree; we have already concluded that chapter 95 is not applicable to Rosales's claims because those claims do not arise from the "condition or use of an improvement to real property."  *See* TEX. CIV. PRAC. & REM. CODE ANN. § 95.002(2).  Accordingly, we conclude it that it was not an abuse of discretion to submit question two on this basis.  We overrule this part of issue three.

## C.    Admission of OSHA Regulations

By its eighth issue, 4Front contends that the trial court erred in admitting evidence of the OSHA regulation pertinent to forklift use and the April 6, 1999 letter issued by OSHA interpreting that regulation.  It argues that the evidence was inadmissible because "it does not establish a standard of care and does not apply outside the employee/employer context."  Rosales argues that the evidence was admissible (1) "to show what Ornelas

---

[15] In fact, had a separate apportionment question been submitted solely on the negligent entrustment theory, it is possible that the jury would have attributed an even higher percentage of responsibility to 4Front.  That is because, as noted, if negligent entrustment is found, the entrustor is held liable for the acts of the entrustee without regard to the degree of negligence of the entrustor.  *See Duenez*, 237 S.W.3d at 698 (quoting *Rosell v. Cent. W. Motor Stages, Inc.*, 89 S.W.3d 643, 657 (Tex. App.—Dallas 2002, pet. denied)).

would have known about basic forklift safety had 4Front not entrusted safety to someone who was willfully blind," and (2) "to show that giving powered industrial trucks to untrained workers poses a significant safety risk."

We review the admission of evidence for abuse of discretion. *Brookshire Bros., Ltd. v. Aldridge*, 438 S.W.3d 9, 27 (Tex. 2014). A trial court abuses its discretion when it acts without regard for guiding rules or principles. *U-Haul Int'l*, 380 S.W.3d at 132. Evidence is "relevant"—and therefore generally admissible—if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." TEX. R. EVID. 401, 402.[16]

4Front is correct that OSHA regulations do not, by themselves, establish negligence per se or create a separate cause of action. *See Wal-Mart Stores, Inc. v. Seale*, 904 S.W.2d 718, 720 (Tex. App.—San Antonio 1995, no writ) (citing *Melerine v. Avondale Shipyards, Inc.*, 659 F.2d 706 (5th Cir. 1981); *Jeter v. St. Regis Paper Co.*, 507 F.2d 973 (5th Cir. 1975); *Kraus v. Alamo Nat'l Bank*, 586 S.W.2d 202, 208 (Tex. Civ. App.—Waco 1979), *aff'd on other grounds*, 616 S.W.2d 908 (Tex. 1981)). 4Front is also correct that "Employees are the exclusive class of persons protected by OSHA regulations." *Id.* "Nevertheless[,] OSHA regulations are admissible into evidence as being relevant to the standards of conduct which should have been employed by a defendant." *Id.*; *see Baker Marine Corp. v. Herrera*, 704 S.W.2d 58, 61 (Tex. App.—

---

[16] Through its motion in limine and objections at trial, 4Front objected to the OSHA evidence in part on the basis that it was unfairly prejudicial. *See* TEX. R. EVID. 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence."). However, 4Front does not make this argument explicitly on appeal. Therefore, we do not address whether the evidence was inadmissible under Rule 403.

Corpus Christi 1985, writ ref'd n.r.e.); *see also Perez v. Smart Corp., Inc.*, No. 04-12-00712-CV, 2013 WL 6203358, at *3 (Tex. App.—San Antonio Nov. 27, 2013, pet. denied) (mem. op.).  As explained by the San Antonio Court of Appeals in *Seale*:

> The relevance of an OSHA standard is that it [is] the cumulative wisdom of the industry on what is safe and what is unsafe.  While OSHA was written to protect employees, an unsafe practice for an employee applies equally well to a customer who legitimately finds himself in the same geographic space as the employee.  Safety principles don't change depending on whether the victim is an employee, a customer, or a passerby.  Therefore it has relevance to the standard of care.

904 S.W.2d at 720; *see* TEX. R. EVID. 401.

In support of its position, 4Front cites *Hill v. Consolidated Concepts, Inc.*, in which the Fourteenth Court of Appeals affirmed the trial court's exclusion of OSHA regulations on the grounds that "our common law is not expanded by OSHA regulations" and, in that case, "the regulations were not relevant to the issue of duty."  No. 14-05-00345-CV, 2006 WL 2506403, at *4 (Tex. App.—Houston [14th Dist.] Aug. 31, 2006, pet. denied) (mem. op.).[17]  The court noted that, had the OSHA regulations been admitted, they "likely would have only confused and misled the jury into believing that [the defendant] had a federally mandated duty to [the plaintiff] that it should enforce in this suit."  *Id.* at *4 n.5.  4Front also cites *Hall v. Dieffenwierth*, in which the Fort Worth Court of Appeals concluded that the exclusion of evidence of OSHA regulations was not error because the defendant was

---

[17] Rosales contends that *Hill* is distinguishable because "*Hill* concerned the admissibility of OSHA *citations*—not regulations" and he contends that "OSHA *regulations* are admissible even if OSHA *findings* and *citations* are not."  However, the *Hill* court evaluated the admissibility of both OSHA regulations *and* OSHA administrative records—including records of citations and administrative proceedings against the defendant—and it found that the trial court did not err in excluding either from evidence.  *Hill v. Consol. Concepts, Inc.*, No. 14-05-00345-CV, 2006 WL 2506403, at *4–6 (Tex. App.—Houston [14th Dist.] Aug. 31, 2006, pet. denied) (mem. op.).

45

not required to comply with those regulations.  No. 02-07-00058-CV, 2008 WL 2404462, at \*4 (Tex. App.—Fort Worth June 12, 2008, pet. denied) (mem. op.).

Under the circumstances presented here, we believe the evidence was relevant and therefore generally admissible under rule 401.  *See* TEX. R. EVID. 401.  The central issue for the jury in this case was whether 4Front's negligence caused Rosales's injuries.  The jury was therefore called upon to determine whether 4Front owed a duty of care to Rosales, because "[i]f there is no duty, there cannot be negligence liability."  *Thapar v. Zezulka*, 994 S.W.2d 635, 637 (Tex. 1999).  "[F]actors which should be considered in determining whether the law should impose a duty are the risk, foreseeability, and likelihood of injury weighed against the social utility of the actor's conduct, the magnitude of the burden of guarding against the injury and consequences of placing that burden on the employer."  *Nabors Drilling, Inc. v. Escoto*, 288 S.W.3d 401, 405 (Tex. 2009); *see Del Lago Partners*, 307 S.W.3d at 767.  Foreseeability of the risk has been called the "foremost and dominant consideration" in the duty analysis.  *El Chico Corp. v. Poole*, 732 S.W.2d 306, 311 (Tex. 1987).  As noted, the test for foreseeability is what a party should, under the circumstances, reasonably anticipate as a consequence of its conduct.  *Boys Clubs*, 907 S.W.2d at 478; *J.P. Morgan Chase Bank*, 302 S.W.3d at 533.  "Though the existence of duty is a question of law when all of the essential facts are undisputed, when the evidence does not conclusively establish the pertinent facts or the reasonable inferences to be drawn therefrom, the question becomes one of fact for the jury."  *Bennett v. Span Indus., Inc.*, 628 S.W.2d 470, 474 (Tex. App.—Texarkana 1981, writ ref'd n.r.e.); *see Mitchell v. Mo.-Kan.-Tex. R.R. Co.,* 786 S.W.2d 659, 662 (Tex. 1990) ("While foreseeability as an element of duty may frequently be determined as a matter of law, in

46

some instances it involves the resolution of disputed facts or inferences which are inappropriate for legal resolution."), *overruled on other grounds by Union Pac. R.R. Co. v. Williams*, 85 S.W.3d 162 (Tex. 2002).

Evidence of OSHA regulations was relevant here because, as "the cumulative wisdom of the industry on what is safe and what is unsafe," *Seale*, 904 S.W.2d at 720, it was probative as to whether 4Front should have reasonably anticipated that an injury would be the consequence of lending a forklift to an untrained independent contractor who had been hired to repair an elevated sign. *See J.P. Morgan Chase Bank*, 302 S.W.3d at 533; *see also* TEX. R. EVID. 401. For the same reason, the evidence was also relevant as to the issue of proximate causation. *See Rodriguez-Escobar*, 392 S.W.3d at 113 (noting that foreseeability is one component of proximate causation). Spear testified that the regulation would be relevant to determining whether 4Front should have known that Reyes, an independent contractor, was incompetent to operate the forklift. Spear additionally stated that, under the 1999 OSHA interpretation letter, warehouse operators are not required to train a contractor's employees but must nevertheless ensure that they are properly trained. Purswell, 4Front's expert, agreed that, even though the letter does not impose an obligation on an employer to train independent contractors, employers must nevertheless ensure that independent contractors "know how to operate the forklift because the safety of your employees, your [ware]house employees [are] at risk because they can get hit." Purswell also testified that, pursuant to the 1999 letter, employers are responsible for ensuring that non-employees who are invited onto the employer's property to assist in loading and unloading are properly trained before they are permitted to operate powered industrial trucks. Accordingly, even if the regulation regarding training of forklift

47

operators technically possesses the force of law only in the employer-employee context, *see* 29 CFR § 1910.178(*l*)(1)(ii) (2014) ("Prior to permitting an employee to operate a powered industrial truck (except for training purposes), the employer shall ensure that each operator has successfully completed the training required by this paragraph . . . ."), the evidence was nevertheless admissible as relevant to the issues before the jury.

*Hill* and *Hall* are distinguishable because the courts in those memorandum opinions found no abuse of discretion in the *exclusion* of evidence. That a trial court was found not to have abused its discretion by excluding evidence of OSHA regulations in other cases does not mean that the admission of such evidence is necessarily an abuse of discretion here. *See Seale*, 904 S.W.2d at 720–21 ("It is elementary . . . that to find a case where evidence was partially excluded under the abuse of discretion standard cannot be used to prove that in another case with different facts that a court was in violation of abuse of discretion for admitting evidence."). Moreover, to the extent *Hill* and *Hall* concluded that OSHA regulations were *per se* inadmissible solely because they cannot affect common law duties, the case law from this Court appears to conflict. *Compare Hill*, 2006 WL 2506403, at *4 (concluding that "the regulations were not relevant to the issue of duty" because "our common law is not expanded by OSHA regulations") *and Hall*, 2008 WL 2404462, at *4 (concluding that the exclusion of OSHA regulations was not error because the defendant "did not violate any OSHA regulation") *with Baker Marine Corp.*, 704 S.W.2d at 61 ("OSHA Regulations are admissible into evidence as being relevant to the standard of conduct which should have been employed by defendant . . . . Despite appellants' prolonged protestations and authorities to the contrary in their brief, we find this to be the applicable rule of law in Texas.").

48

We overrule 4Front's eighth issue.[18]

## D. Incurable Jury Argument

We finally address 4Front's first issue, in which it argues that it is entitled to a new trial because Rosales's counsel made "deliberate, racially charged attacks and shameless appeals to ethnic solidarity and local bias" in his closing argument at trial. The argument about which 4Front complains is as follows:

> [I]n closing, I'm going to read something from you—from Abraham Lincoln here in just a second, but first I want to tell you something about my upbringing.
>
> My—I'm the first person in my family to go to college. And I know about men that work out of trucks because I was raised by one. And I want to tell you that men that scrape and work day in and day out to help their families are entitled to the same exact safety that 4Front's employees in Dallas are. And I believe that in my bones. You are the conscience of this community. You will tell 4Front whether you believe that. 4Front remains willfully blind, willfully blind. That means they're choosing not to see. They are choosing not to see. . . .
>
> I want to read to you this and this is really instructive for what you have to do. Abraham Lincoln, before the Civil War visited New Orleans. He was in a crowded downtown street when he saw a slave being beaten savagely. His aid[e] whispered to him, Isn't that the worst thing you've ever seen? The president answered, No. The beating isn't the worst thing. The worst thing I've ever seen is that the man is being beaten and no one is in this whole crowd is doing anything about it.
>
> Everyone in the crowd was willfully blind to the injustice that was occurring and that's exactly what's happening at 4Front. Not one Dallas, Wisconsin or Canadian representative from 4Front stepped into this courtroom. Not one of them sat here on this stand or sat at the table. That's because they don't think that the injuries that Carlos Rosales suffered are significant enough to warrant their time to be here. When his shoulder was shattered

---

[18] 4Front further argues by its eighth issue that the trial court erred by failing to give the following proposed jury instruction: "As the premises owner, 4Front was not subject to any OSHA regulations as they pertain to the premises or to activities of independent contractors or the employees of such contractors." 4Front does not, however, support this argument with references to authority regarding jury charge error. Accordingly, the argument is waived. *See* TEX. R. APP. P. 38.1(i).

in the multiple pieces and he was crying out, they say, It's your fault. You knew what you were getting into.

When his hip broke and the bones derided [sic] and his muscles pulled his leg and shortened his leg, they say, You know what? Every man for himself. When his brain hit the concrete, bleeding occurs, ripping and tearing in the brain, they say, Sorry. You, you should have told Mr. Francisco Reyes what to do. The hypocrisy of their position should frustrate you, ladies and gentlemen. And the only way that you can tell those people in that boardroom, wherever they are, that Carlos Rosales matters, that men that work out of their trucks in Hidalgo County matter, is with your verdict.

I believe in you. We had a tough job in this case. 4Front, they spent money on what was important to them. They hired an expert for 325 dollars an hour and they hired three law firms, three large law firms from Wisconsin, Houston and McAllen to come in here and tell you they have zero responsibility. We were taking on Goliath. We're a four lawyer law firm. When David took on Goliath, he reached down and he picked up five smooth stones. . . . Five smooth stones. You are the smooth stones, ladies and gentlemen. You—I'm leaving my client's fight here with you. If you believe in this case and this cause, go into that jury room and fight for Carlos Rosales.

### 1.    Standard of Review and Applicable Law

Ordinarily, a complaint regarding improper jury argument must be preserved by a timely objection that is overruled. *Living Ctrs. of Tex., Inc. v. Peñalver*, 256 S.W.3d 678, 680 (Tex. 2008); *see* TEX. R. APP. P. 33.1. But if a jury argument is incurable, then a contemporaneous objection is not required; instead, such a complaint is preserved for appeal if it is raised in a motion for new trial. *See* TEX. R. CIV. P. 324(b)(5); *Phillips v. Bramlett*, 288 S.W.3d 876, 883 (Tex. 2009). Here, 4Front did not object to the argument when it was made, but complained about the argument in a motion for new trial which was overruled. Therefore, the issue is preserved for our review. *See Phillips*, 288 S.W.3d at 883.

To obtain a reversal of a judgment on the basis of incurable jury argument, a party must establish (1) an error, (2) that was not invited or provoked, (3) that was preserved

at trial by a proper objection, motion to instruct, or motion for mistrial, and (4) that was not curable by an instruction, a prompt withdrawal of the statement, or a reprimand by the trial court. *Standard Fire Ins. Co. v. Reese*, 584 S.W.2d 835, 839 (Tex. 1979).

"Incurable jury argument is rare" because "[t]ypically, retraction of the argument or instruction from the court can cure any probable harm." *Phillips*, 288 S.W.3d at 883 (citing *Peñalver*, 256 S.W.3d at 680). The party claiming incurable harm must persuade the court that, based on the record as a whole, the offensive argument was "so extreme that a 'juror of ordinary intelligence could have been persuaded by that argument to agree to a verdict contrary to that to which he would have agreed but for such argument.'" *Id.* (quoting *Goforth v. Alvey*, 271 S.W.2d 404, 404 (Tex. 1954)). Incurable argument is "that which strikes at the very core of the judicial process." *Id.* (citing *Peñalver*, 256 S.W.3d at 681–82). Jury argument that strikes at the appearance of and the actual impartiality, equality, and fairness of justice rendered by courts is incurably harmful not only because of its harm to the litigants involved, but also because of its capacity to damage the judicial system. *Peñalver*, 256 S.W.3d at 681

Texas courts have recognized that appeals to racial or ethnic prejudice may render a jury argument incurably improper. In *Peñalver*, a wrongful-death case, the Texas Supreme Court held that jury argument comparing the defendant nursing home's conduct to medical experimentation on the elderly in Nazi Germany was incurable. 256 S.W.3d at 679. In *Showbiz Multimedia, LLC v. Mountain States Mortgage Centers, Inc.*, the Houston First Court of Appeals determined that counsel's reference to the plaintiff, a naturalized United States citizen born in India, as committing "judicial terrorism" was incurably improper. 303 S.W.3d 769, 770–72 (Tex. App.—Houston [1st Dist.] 2009, pet.

denied) (noting that counsel also made a statement—which was "wholly unsupported by the record"—that a business associate of the plaintiff was "scared to death of this man" due to unspecified "cultural issues"). In *Texas Employers' Insurance Ass'n v. Guerrero*, the San Antonio Court of Appeals ordered a new trial where plaintiff's counsel made the following remark in closing argument:

> I am tickled to death to be here and I will represent him and any man like him in Zavala, Maverick, Dimmit, Cameron, any county in the State of Texas any time.
>
> Octavio Paz, a well-known author said one time, and I will quote him and I already translated it. He said, "Things that unite us far exceed those things that divide us."
>
> You apply that to evidence. The things, the preponderance of the evidence, that unite in favor of Mr. Guerrero, far exceed those inconsistencies, the legal problems. He is not a perfect man, neither is his medical. But heck, he went back to work after he got cut, things of this nature. The things that unite us, exceed those that divide us. There is a time to be united. Right now is a time to be united.
>
> An example is politics. We don't have to agree with all the candidates, with the same ones. But by golly there comes a time when we have got to stick together as a community. We have to stick together as a jury of peers of a man to pass judgment and help that person if he is entitled to [sic] under the evidence. . . .
>
> Because if one is united, one has hope. And with hope, one can live. He still has a lot of years to live. And it is all going to depend on you.

800 S.W.2d 859, 862 (Tex. App.—San Antonio 1990, writ denied). The court rejected the plaintiff's argument on appeal that the argument was merely "a request that the jury view Guerrero's case as more united by consistencies than divided by legal technicalities." *Id.* Instead, the court found that the argument was a "forbidden ethnic plea" and was *per se* incurable. *Id.* at 866 ("We hold that incurable reversible error occurs whenever any attorney suggests, either openly or with subtlety and finesse, that a jury feel solidarity with or animus toward a litigant or a witness because of race or ethnicity.").

## 2.    Analysis

4Front argues that "[t]he purpose of Rosales's rebuttal jury argument was obvious: Cast 4Front as the person beating the slave (Rosales) in a crowded street and convince the jurors that what is worse than the beating is if they (who observed it) do nothing about it." In fact, counsel repeatedly referred to 4Front as "willfully blind," making clear that, in his analogy, 4Front is comparable to the crowd that stood by doing nothing while the slave was beaten—not, as 4Front suggests, to the person actually carrying out the beating. This was consistent with Rosales's general theory that 4Front was liable for his injuries in part because it failed to take responsibility for ensuring that the forklift was operated properly.

In any event, we do not believe that the argument at issue constituted the type of appeal to racial or ethnic prejudice that required reversals in *Peñalver*, *Showbiz*, or *Guerrero*. 4Front notes that ten of the twelve jurors and the alternate juror in this case had Hispanic surnames, a point which was also raised by the *Guerrero* court. *See* 800 S.W.2d at 862 (noting "that eleven of the twelve jurors had Spanish surnames, as did Guerrero, his trial attorney, and his treating doctor"). But the story told by Rosales's counsel involved a black slave in antebellum New Orleans, and there is no suggestion that any African-Americans were involved in this case as a juror, witness, party, attorney, judge, or in any other capacity. Of course, if counsel had indeed made an appeal to ethnic or racial prejudice, the mere fact that the victim in the story was not of the same race or ethnicity as most of the jurors would not render the argument acceptable.[19] But

---

[19] 4Front argues in its appellate reply brief that "[w]hether the jurors are the same race or ethnicity as the victim in the Abraham Lincoln story makes no difference" and notes that, in *Peñalver*, where the argument at issue compared the defendant to the Nazi regime, "the Court's inquiry did not concern whether the jurors or parties were Jewish." However, the defendant in *Peñalver* was being accused of mistreating

that fact itself indicates that counsel did not intend for his argument to be understood as an appeal to racial or ethnic prejudice—and it indicates that jurors most likely did not understand it as such.[20]

Further, we find *Peñalver* and *Showbiz* distinguishable. In *Peñalver*, counsel explained that Nazi Germany "had a project called T-Four" where "they took all the people who they thought were inferior in society, primarily older people, impaired people, and they used them for experiments. They killed them. Over 400,000." 256 S.W.3d at 680. Counsel then asserted that the defendant's position was that damages were minimal merely because the plaintiff is "old" and "impaired"; and he asked: "Have we regressed

---

*elderly* people, and that—not the mistreatment of Jewish people—is precisely the behavior described in counsel's Nazi comparison. *Living Ctrs. of Tex., Inc. v. Peñalver*, 256 S.W.3d 678, 680 (Tex. 2008). We therefore disagree that it is irrelevant whether the victim in the story was of the same race or ethnicity as the jurors or parties.

[20] The San Antonio Court of Appeals held in *Guerrero* that racial or ethnic appeals are impermissible, whether explicit or implicit:

> The law should not stoop to evaluating subtle distinctions such as whether an argument was too crude and revolting, or on the other hand sufficiently slick and artful to pass muster. To permit the sophisticated ethnic plea while condemning those that are open and unabashed would simply reward counsel for ingenuity in packaging. Inevitably, lawyers representing their clients zealously within the bounds of the law would test the limits and fine-tune their arguments to avoid being too explicit. Courts would be asked to label some arguments permissible and uphold them with a wink when everyone knew that an ethnic appeal had been made. That course would demean the law and perhaps deepen the divisions from which society already suffers. . . .

> If we were to affirm the judgment before us, we would establish a precedent permitting calculated, subtle racial or ethnic arguments by all litigants in all types of cases—personal injury, family law, commercial—provided the arguments were properly dressed up and disguised. Such a decision would insulate appeals for "unity" when minority litigants found themselves in court before juries in other parts of this state. That is a real and frightening prospect in this nation of immigrants. All litigants—anglo, black, hispanic, native American, oriental, and all others, including governmental and business entities—should feel free to litigate their cases before juries in all 254 counties without facing state-of-the-art ethnic pleas in closing argument. Such arguments are forbidden, and it matters not whether counsel suggests—depending upon the venue—that the jury reward or penalize a litigant for belonging or not belonging to a racial or ethnic group.

*Tex. Emp'rs' Ins. Ass'n v. Guerrero*, 800 S.W.2d 859, 865 (Tex. App.—San Antonio 1990, writ denied). We share the *Guerrero* court's concern, but we do not believe that the argument at issue here constituted an implicit or explicit racial or ethnic plea.

to 1944, 1945 Germany?" *Id.* The Texas Supreme Court characterized this argument as "comparing trial counsel to perpetrators of the T-4 Project atrocities" even though there was no evidence that the defendant "intended to injure or kill" the plaintiff or that the defendant performed medical experiments on her. *Id.* at 681–82. The supreme court concluded that the argument "was designed to incite passions of the jury and turn the jurors against defense counsel for doing what lawyers are ethically bound to do: advocate clients' interests within the bounds of law." *Id.* at 682. The supreme court held that the defendant "was entitled to urge a smaller damages amount than the plaintiffs sought without being painted as modern-day equivalents of T–4 Project operators who experimented on and purposefully killed humans." *Id.* Here, on the other hand, though Rosales's counsel may have sought to incite the jury, we do not believe such incitement was intended to be made on the basis of racial or ethnic unity or animus. Instead, the argument may be seen as a response to testimony elicited by 4Front, in particular from Purswell, arguing that 4Front had no responsibility to monitor or supervise independent contractors. Moreover, counsel's accusation that 4Front was "willfully blind" to danger—even when made in the context of a story involving the beating of a slave—is not as inflammatory as counsel's suggestion in *Peñalver* that the defendant viewed elderly people as worthless, as the Nazis did. Nor is it as inflammatory as the suggestion in *Showbiz* that the plaintiff, who hailed from south Asia, was a "judicial terroris[t]." *See* 303 S.W.3d at 772.[21] At worst, the argument made by Rosales's counsel in this case can be

---

[21] The *Showbiz* court, referencing *Peñalver*, noted that "[j]ust as the horrible events of World War II still evoke deep passion and emotion, the ongoing War on Terror colors the interpretation of the word 'terrorism.' It is not a word to be used lightly in the context of a formal proceeding in court." *Showbiz Multimedia, LLC v. Mountain States Mortg. Ctrs., Inc.*, 303 S.W.3d 769, 772 (Tex. App.—Houston [1st Dist.] 2009, no pet.). Slavery is, of course, also a word that evokes passion and emotion in light of our nation's history, and it must not be used lightly. But the mere fact that Rosales's counsel told a story involving the beating of a slave does not mean that the argument constituted an improper appeal to racial prejudice. For

described as hyperbole, which is generally a permissible rhetorical technique in closing argument. *See Reese*, 584 S.W.2d at 838; *PopCap Games, Inc. v. MumboJumbo, LLC*, 350 S.W.3d 699, 721 (Tex. App.—Dallas 2011, pet. denied).

Considering the record as a whole, we conclude that the argument at issue was not so extreme as to cause incurable harm. 4Front's first issue is overruled.

### III. CONCLUSION

We modify the judgment to delete the award of exemplary damages, and we affirm the trial court's judgment as modified. *See* TEX. R. APP. P. 43.2(b).

DORI CONTRERAS GARZA,
Justice

Delivered and filed the
12th day of March, 2015.

---

the reasons discussed herein, we do not believe that it was.

56